IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 8, 2020

**STATE OF TENNESSEE v. DAVID BYRON ALEXANDER, JR.**

**Appeal from the Circuit Court for Henderson County**
**No. 18190-2      Donald Allen, Judge**

_____

**No. W2019-00839-CCA-R3-CD**

_____

The Defendant, David Byron Alexander, Jr., was convicted by a Henderson County
Circuit Court jury of aggravated assault, a Class C felony; two counts of vandalism
valued at $1000 or less, a Class A misdemeanor; aggravated criminal trespass, a Class A
misdemeanor; and domestic assault, a Class A misdemeanor. *See* T.C.A. §§ 39-13-102
(2018) (aggravated assault); 39-14-408 (2018) (vandalism); 39-14-105 (2018) (grading);
39-14-406 (2018) (aggravated criminal trespass); 39-13-111 (2018) (domestic assault).
The trial court sentenced the Defendant to eleven months, twenty-nine days for each
misdemeanor conviction and to six years for aggravated assault. The court ordered
concurrent service of the misdemeanor sentences and consecutive service with the six-
year sentence, for an effective sentence of six years, eleven months, and twenty-nine
days. The court, likewise, ordered the Defendant to serve his effective sentence
consecutively to a six-year sentence imposed in an unrelated drug case. On appeal, the
Defendant contends that (1) the evidence is insufficient to support his convictions and (2)
his sentence is excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE
R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Samuel W. Hinson, Lexington, Tennessee, for the appellant, David Byron Alexander, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Deputy
Attorney General; Jody Pickens, District Attorney General; Joshua B. Dougan, Assistant
District Attorney General, for the appellee, State of Tennessee.

# OPINION

The Defendant's convictions relate to incidents occurring in January 2018, that resulted in an indictment charging five counts of vandalism, two counts of burglary of a vehicle, two counts of theft, aggravated burglary, aggravated assault, and domestic assault. At the trial, Bradley Blackburn testified that in January 2018, he and the Defendant worked at the same construction company. Mr. Blackburn recalled an "unusual" conversation he had with the Defendant on January 2, 2018. Mr. Blackburn said that the Defendant reported being "upset" with Kassandra Peralta, who was the mother of the Defendant's son, and Susan Davidson, who was Ms. Peralta's mother. Mr. Blackburn said the Defendant stated that he was going to "mess up" their vehicles to prevent them from going to work and that the Defendant had "whatever reasons" for being angry. Mr. Blackburn said the Defendant stated, "[H]e would vandalize or destroy their property." When asked if the Defendant gave reasons for wanting to destroy the women's property, Mr. Blackburn understood that the Defendant and Ms. Peralta were fighting and that the Defendant was preparing to move out of their home.

On cross-examination, Mr. Blackburn testified that the Defendant had also stated his intent to destroy Ms. Peralta's and Ms. Davidson's vehicles before January 2, 2018. Mr. Blackburn recalled the Defendant said that he was "going to f--- up their s---." Mr. Blackburn agreed that the Defendant did not admit "going through with it." Mr. Blackburn said that he received a telephone call from Ms. Peralta, who reported the vandalism to him, and that Mr. Blackburn told the Defendant about it. Mr. Blackburn denied that he disliked the Defendant. When asked if he had learned a few days before speaking to the police that the Defendant had been having an affair with Mr. Blackburn's then-fiancée, Mr. Blackburn said that they did not have an affair.

On redirect examination, Mr. Blackburn testified that he inspected Ms. Peralta's and Ms. Davidson's vehicles, that the Dodge truck "wouldn't even crank" because the starter had been unplugged, and that the "valve stems" had been "let out" of the tires of Ms. Peralta's Chrysler Pacifica. He said that the damage was "little petty stuff" meant to prevent the vehicles from going anywhere. He said that he plugged in the starter, installed a few fuses, and "got [the Dodge] cranked for them." On recross-examination, Mr. Blackburn stated that he had not inspected the vehicles previously and that he did not know if the vehicles had been inoperable before January 2.

Gregg Middleton, Shop Foreman at Downtown Auto Care, testified that he repaired Ms. Davidson's white Chrysler 200. He said that he had performed routine maintenance on the car since Ms. Davidson bought it. He said that in January 2018, the car was towed to his shop, that the car would not start, and that he determined the car had an "ASD relay problem," which he described as an automatic shutdown based upon "some kind of problem." He recalled that he removed the car's rear seat to gain access to

the fuel tank, that fuel began "coming out," and that he saw a "gritty-looking" substance on the fuel tank. He denied that the substance was consistent with someone accidently placing diesel in a fuel tank made for gasoline. He cleaned the fuel tank and the fuel line with compressed air, placed cleaner inside the fuel tank, and replaced the spark plugs. He said that the car started, that he drove it a short distance, and that the car had a "rough idle." He recalled that he used a "high-powered fuel injector cleaner" before returning the car to Ms. Davidson, that she drove the car for a few days, that the check engine light came on, and that she returned the car to him. He said that "it cleared out" eventually, that he determined trash had stopped up the fuel injector, and that the car was "fine" at the time of the trial.

Mr. Middleton testified that he had never seen this type of problem, although he had been around service garages all of his life. He thought someone had placed something inside the fuel tank, although he did not know whom. He said that he did not find evidence of water inside the fuel tank. When asked about the charges to repair the damage, he stated that two cans of Seafoam cleaner, four spark plugs, "other service and stuff," fresh fuel, one bottle of "BG 44K," and labor totaled $275 to $300.

On cross-examination, Mr. Middleton testified that he had serviced Ms. Davidson's car more than ten times since she bought it. He said that in order to access the fuel tank, he had to remove the back seat and that the car had "a screw-out type pump." He said that the fuel tank was not easily accessed if the car were locked and that he saw "no evidence of nothing being taken off." He said that unscrewing the tank left "visible marks" and that he saw none. He concluded that "nobody was in and under the seat." Mr. Middleton agreed that if the car were "tampered with," the person responsible would have been outside the car. He said that, in his opinion, the fuel system was "stopped up coming out of the pump through the fuel lines to the injector rail." He said that something was placed in the fuel tank and that "it was not an accident."

Susan Davidson testified that she, Ms. Peralta, and Ms. Peralta's three children lived together. Ms. Davidson said the Defendant was Ms. Peralta's former boyfriend and described the nature of the Defendant and Ms. Peralta's relationship in late 2017 as "very controlling and very manipulative." Ms. Davidson said that on December 26, 2017, Ms. Peralta moved out of Ms. Peralta's home and into Ms. Davidson's home.

Ms. Davidson testified that on New Years' Eve 2017, the Defendant would not leave them alone. She said that the Defendant's daughter, whose mother was not Ms. Peralta, was at Ms. Davidson's home, that the Defendant called the home and sent text messages repetitively, and that he played "head games." Ms. Davidson said eventually, she turned off the phones. She said that on January 1, 2018, she awoke to the Defendant's screaming, "Let me in." She said that he banged on the doors and windows, that the Defendant wanted to see his daughter, and that his daughter "begg[ed] us not to

let her go." Ms. Davidson recalled that the Defendant made multiple threatening statements, including that Ms. Peralta "would pay for this" and that he would ensure Ms. Peralta would never see his daughter again. Ms. Davidson said that Ms. Peralta called the Department of Children's Services (DCS) because the Defendant's daughter was age twelve at the time. Ms. Davidson said that her outside light and door handle were broken during the incident because the items were operational before January 1. She said that the Defendant left but returned with a police officer, who instructed her that she had to allow the Defendant to have his daughter. Ms. Davidson said that the Defendant left with his daughter, that the situation calmed for a period of time, that later the Defendant began calling Ms. Davidson's home again, that he threatened to "hurt" an unidentified person and that he said, "[Y]ou're going to pay for this."

Ms. Davidson testified that on the morning of January 2, 2018, she found two flat tires on her 2015 Chrysler 200 when she attempted to leave for work and that the key fob, which she kept in the cup holder, was missing. She said the car was not locked on the night of January 1 because the key fob was inside the car. She said that she drove her 2007 Dodge truck to work because she did not have time to address the flat tires on her car. She said she advised everyone inside the home to lock to the doors and windows and not to "mess" with the Defendant. She said that she returned home around 4:30 p.m., that she and everyone at the home left, and that they drove her truck to Ms. Peralta's home to allow Ms. Peralta to gather some of her and her children's belongings. Ms. Davidson said that, before driving to Ms. Peralta's home, she requested a sheriff's deputy meet them at the home but that they arrived before a deputy. She said they entered the home, which had been "ransacked." She said that everything Ms. Peralta owned had been ruined and destroyed, including Ms. Peralta's clothes. Ms. Davidson recalled that the walls had been damaged and that a door had been torn off its hinges.

Ms. Davidson testified that at around 7:00 p.m., a sheriff's deputy called her cell phone when everyone was leaving Ms. Peralta's home and that she advised the deputy that his assistance was not needed. She said that seconds after the call ended, the Defendant arrived at the home. She said that cell phone reception was poor in the area, that they locked themselves inside the home, that they were "trapped," and that the Defendant began screaming and banging on the door. She said that the Defendant calmed and began "playing with [Ms. Peralta's] head." Ms. Davidson said that the Defendant stated he would "give" his daughter, whom the Defendant said was inside his car, to Ms. Peralta if Ms. Peralta came outside to talk. Ms. Davidson said that she unsuccessfully attempted to call the deputy during this time, that Ms. Peralta eventually opened the door and spoke to the Defendant long enough for everyone to get inside Ms. Davidson's truck, and that they left. Ms. Davidson said that she, Ms. Peralta, and the children were scared. Ms. Davidson stated that after they returned to her home, she used a second key fob to attempt to start her Chrysler 200 but that the car would not start.

Ms. Davidson testified that on the morning of January 3, 2018, her Dodge truck would not start when she attempted to leave home for work. She said that she awoke Ms. Peralta because Ms. Davidson needed her assistance in getting to work but that Ms. Peralta's Chrysler Pacifica would not start, either. Ms. Peralta said that the Pacifica had been ransacked as though someone had been looking for something.

Ms. Davidson testified that she had her Chrysler 200 serviced by Mr. Middleton after she filed a police report. She said Mr. Middleton was the only mechanic who had worked on her car and that the car was routinely serviced every 3000 miles. She said that the car was repaired after about three weeks but that she returned the car because it was "dragging" and was not right. She said that Mr. Middleton told her to "drive the fire out of it" and that she drove it as much as she could while continuing to use "the treatment" in the gas. She said it was a long time before the car ran properly again. When asked if she remembered what she paid to repair the car, she said $65 to have the car towed, $500 to Mr. Middleton, who "cut . . . a deal on the labor," $235 for "a couple of different services," and an undisclosed amount to replace the flat tries.

Ms. Davidson testified that the Defendant did not have her permission to enter her vehicles and that he did not have permission to be on her property.

On cross-examination, Ms. Davidson testified that she did not like the Defendant, although she liked his family. Ms. Davidson denied that the Defendant and Ms. Peralta had argued about custody of the Defendant's daughter but agreed Ms. Peralta wanted custody. Ms. Davidson said, though, that by late 2017 and early 2018, the Defendant did not want Ms. Peralta to have custody of the Defendant's daughter, if the Defendant could not "have" Ms. Peralta. Ms. Davidson said that the Defendant and Ms. Peralta did not fight about the Defendant's daughter and that the Defendant agreed to allow Ms. Peralta to have custody if the Defendant could live with Ms. Peralta. Ms. Davidson said, though, that Shelly Alexander, who was the Defendant's relative, obtained custody of the Defendant's daughter. Ms. Davidson agreed that she and Ms. Peralta were unhappy with the custody resolution.

Ms. Davidson testified that on January 1, 2018, all three of the vehicles at her home were operational. She said that although she knew her car had been "tampered with" on January 2, she did not call the police about the car until January 3, when she learned all three vehicles had been damaged. She said that two flat tires alone did not warrant police involvement. She said that the Defendant had already removed his belongings from Ms. Peralta's home when she, Ms. Peralta, and the children drove to Ms. Peralta's home on January 2.

Ms. Davidson testified that Ms. Peralta and the Defendant lived together for about three years. Ms. Davidson said, though, that the Defendant was "kicked out" in October 2017. She said that she knew the Defendant vandalized her vehicles because he threatened to do it and that she told the police on January 3 about the threats. She agreed she did not see who "tampered with" her vehicles. She said that the only evidence left in her driveway was "this thing" under her car that took "the sprouts off of tires" and that she did not know how it got there. She said that her car's key fob was found under her truck.

Kassandra Peralta testified that she met the Defendant in October 2013, and that he began staying at her home after they began a romantic relationship. She and the Defendant shared a son. She said that she bought another home in April 2014, and that she, the Defendant, her three sons, and the Defendant's daughter lived at the home. Ms. Peralta said that as 2017 progressed, their relationship deteriorated and that it became unhealthy for her and the children. She said that in September or October 2017, she told the Defendant to leave her home but that he refused. She said that in late December 2017, she told the Defendant he had to leave by Christmas, that the Defendant refused, that she left her home the day after Christmas, and that she moved into her mother's home. She said that the Defendant became "irate" and that she was scared to return to her home.

Ms. Peralta testified that on January 3, 2018, she awoke to find that her Chrysler Pacifica had been ransacked and that the tires were flat. She said that her mother woke her because something was wrong with her mother's car, that she was going to take her mother to work, and that she saw the condition of the car. Ms. Peralta said that someone had been inside and "tampered with" her car and that the car was messy. She said she called Mr. Blackburn, who was the father of her children, and asked him to look at the vehicles. She said that "they" repaired the tire stems.

Ms. Peralta testified that on the evening of January 2, 2018, she, her mother, and her children drove to her home. Ms. Peralta recalled that her mother drove the truck because something was wrong with her mother's car. Ms. Peralta said that her home had been destroyed and "trashed." She recalled that her and her children's clothes were strewn about the home, that her underwear was cut and ripped, and that her pants were ripped in the crotch area. She said that the walls had holes and various items had been thrown throughout the home. She said that as they were about to leave the home, the Defendant arrived. She said that he was belligerent and that she had never seen him "so crazy." She said that they locked the door and that the Defendant said, "If you don't come out, so-and-so is going to happen to your mama, so-and-so is going to happen to you." She recalled that the Defendant said, "I will have it my way, one way or another." She clarified the Defendant said, "I'm going to f------ kill you," and that he would "find a way to make it look like he didn't do it."

-6-

Ms. Peralta testified that she did not witness anyone damage her home or car. She said, though, the Defendant had threatened multiple times that "something was going to happen" to her car, that her children would be taken from her, and that she would lose her job. She said that the Defendant made these threats on January 1. She said that the Defendant sent text messages throughout the day, contacted her through Facebook, and made "private calls." She said that she turned off her cell phone at night in order to sleep. She recalled that he threatened "everyone" on her Facebook account with whom she had discussed their relationship. She said the Defendant stated in a text message that "one way or another, [she] was going to pay for leaving him." Ms. Peralta said that during phone calls, the Defendant threatened to kill himself if she did not return home, threatened to keep her children from her, threatened to kill her, and threatened her mother.

Ms. Peralta testified that on January 1, the Defendant came to her mother's home, that he ripped off the handle to the screen door, and that he threatened "all of us." She said that the screen door was locked, that the Defendant demanded to see his daughter, and that a sheriff's deputy came to the home.

Ms. Peralta testified that on January 10, her mother called when her mother left for work to report a trash bag was at the end of the driveway. Ms. Peralta said that she retrieved and opened the bag and that a suitcase was inside. She said that the suitcase contained items from her home, her car, and her children's belongings. She said that her sunglasses, cell phone charger, and MP3 player, all of which had been inside her car, were inside the suitcase. She recalled that she had not cleaned her car since the January 3 incident and that she did not realize the items had been missing from her car until she saw them in the trash bag.

Ms. Peralta testified that on January 11, she left home for work driving her Chrysler Pacifica and that she always drove the same route. She said that during the drive, she saw the Defendant in his father's Ford Explorer, which she said had a "Browning" sticker on the back and which the Defendant had driven when he lived at her home. She said that she drove past the Defendant, who had parked the Explorer at "Douglas Doors," and that the next thing she saw was the Explorer to her right on the roadway. She said that the Defendant honked the horn, waved at her, and rolled down his window. She said that, in response, she turned up the music in order to "block out" the Defendant. She said that her attempt was unsuccessful, that she attempted to take a photograph of the Defendant, and that he "leaned all the way back in his seat" to prevent her from obtaining a photograph. She said that the Defendant continued following her, that she slammed on the brakes, that the Defendant drove past her, and that she "got behind" the Defendant. She said that she had hoped the Defendant would drive away but that the Defendant "all of the sudden just got on my side of the road. So I drove up on the curb to keep from being hit." She said her hand would not have fit between the two

vehicles. She said that she was on her cell phone with the police just before the Defendant attempted to strike her car. She said she was scared that "something was fixing to happen" to her.

Ms. Peralta testified that although the Defendant lived at her home for about three years, the Defendant never possessed a key. She agreed she participated in a women's "message group" but denied she had discussed obtaining custody of the Defendant's daughter with the group members. She denied telling the group members that she was tired of the courts not helping her with the Defendant's daughter and that she was going to take matters into her own hands. Ms. Peralta said that she had never petitioned a court to obtain custody of the Defendant's daughter. Ms. Peralta agreed she no longer had a relationship with the Defendant's daughter.

Ms. Peralta testified that although her home had been ransacked and destroyed on January 2, she saw no evidence that someone tried to break into the home from the outside. She agreed that she did not file a police report immediately. She said that although the Defendant sent threatening text messages and Facebook messages, she did not provide them to the police. She said that she did not report any stolen items from her car until the suitcase containing items from her car arrived. She said that in addition to the items she previously identified, her car title was inside the suitcase. She said that the Defendant was the only person who had threatened to harm her car and that she had already sought charges against the Defendant when the suitcase arrived.

Ms. Peralta testified that her car was not repaired by a mechanic and that the problem "was an easy fix." She said that she video-recorded the Defendant's following her on January 11. She agreed that initially she continued driving to work, although she had called the police. She said that after she arrived at work and before she could begin working, "they" told her to go to the police station. She said that she drove to the police station, that she showed the recording to an officer, and that she returned to work later. She said that she was scared, that she wanted to get away from the Defendant, and that she called the police because she was concerned the Defendant would follow her to work.

Ms. Peralta testified that on January 2 and 3, she saw the Defendant "running up and down the roads" when she went outside her mother's home to smoke cigarettes. Ms. Peralta said that she told this to her mother, who had been on the telephone with the police. She said that she was the sole owner of the home that had been ransacked. She said that she did not bring to the trial a copy of the deed to her home and that she was unaware she needed to bring it. She agreed that her sister's former boyfriend, Tristan Carter, visited Ms. Davidson's home between December 2017 and January 2018.

Tristin Carter testified for the defense that he was confined at the Henderson County jail at the time of the trial. He said that he knew Ms. Davidson and Ms. Peralta because they had been his neighbors and because he had a previous romantic relationship

-8-

with Ms. Peralta's sister. He said that he had known the women since late 2011 and that he began dating Ms. Peralta's sister in late 2017. He said that between December 2017, and January 2018, he was at Ms. Davidson's home several times per week to visit Ms. Peralta's sister and stayed overnight occasionally.

Mr. Carter testified that he drove Ms. Davidson's Chrysler 200 several times, that the car had two key fobs, that the main fob was kept "in one of each other's purses most of the time," and that the secondary fob was kept on the kitchen table. He said that the car "had a bad set of tires" because he put air in the tires several times. He said he saw "the wires chopped up inside and wire showing inside of the tire."

Mr. Carter testified that he celebrated New Years' Eve at Ms. Davidson's home on December 31, 2017, that he stayed overnight, and that he left the next morning but returned around lunchtime. Mr. Carter said that when he was at Ms. Davidson's property, he never saw the Defendant.

Mr. Carter testified that he was at Ms. Peralta's home in late January or early February 2018, to help Ms. Peralta move out. He said that the home did not appear to have been "broken into . . . and trashed." He said that he did not see holes in the walls and broken doors. Relative to a hole in a door at Ms. Davidson's home, Mr. Carter said the hole was caused by Ms. Peralta's sister's former boyfriend, not the Defendant.

Mr. Carter testified that, on several occasions, he overheard Ms. Davidson and Ms. Peralta discuss the Defendant's daughter and that the conversations were with what he considered to be "malicious intent." He said that Ms. Peralta and Ms. Davidson were attempting to take the Defendant's daughter from the Defendant and the Defendant's family.

Mr. Carter testified that, at the time of the trial, he and the Defendant were incarcerated in the same pod at the jail. Mr. Carter stated that he questioned the Defendant about the events at issue in this case and that Mr. Carter offered to testify on the Defendant's behalf. Mr. Carter denied that the Defendant had threatened or coerced him to testify.

On cross-examination, Mr. Carter testified that his romantic relationship with Ms. Peralta's sister had ended and that he had pleaded guilty to aggravated burglary and to aggravated domestic assault against Ms. Peralta's sister. Mr. Carter denied having "any bad blood" against Ms. Peralta's sister, although he had been convicted of assaulting her with a knife. When asked if he had discussed this case with the Defendant, Mr. Carter said, "Not this case in particular. The happenings, yes."

Upon this evidence, the jury convicted the Defendant of two counts of vandalism of property valued at less than $1000 in connection with Ms. Davidson's vehicles, aggravated criminal trespass of Ms. Peralta's home, aggravated assault of Ms. Peralta, and domestic assault of Ms. Peralta. The jury acquitted the Defendant of the remaining charges. This appeal followed.

## I.    Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions because the State only presented circumstantial evidence. He likewise asserts that the trial court erred by failing to merge the aggravated assault and domestic assault convictions. The State responds that the evidence is sufficient and that the Defendant has waived appellate consideration of merger of the offenses.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009))

### A.    Aggravated Assault and Domestic Assault

As relevant to this case, "A person commits assault who . . . [i]ntentionally, knowingly, or recklessly causes another to reasonably fear imminent bodily injury[.]" T.C.A. § 39-13-101(a)(2) (2018). "A person commits aggravated assault who . . . [i]ntentionally or knowingly commits assault as defined in § 39-13-101, and the assault . . . [i]nvolved the use or display of a deadly weapon[.]" *Id*. § 39-13-102(a)(1)(A)(iii).

"A person commits domestic assault who commits an assault as defined in § 39-13-101 against a domestic abuse victim." *Id*. § 39-13-111(b). A domestic abuse victim is

defined, in relevant part, as "[a]dults . . . who are dating or who have dated or who have or had a sexual relationship, but does not include fraternization between two (2) individuals in a business or social context[.]" *Id*. § 39-13-111(a)(3).

In the light most favorable to the State, the evidence reflects that the Defendant's and Ms. Peralta's romantic relationship was ending and that the Defendant was angry with Ms. Peralta. The Defendant threatened her and Ms. Davidson on multiple occasions in the days before the offenses. On January 11, 2018, Ms. Peralta left home for work driving her regular route. The Defendant, who was driving a Ford Explorer, began following Ms. Peralta. He honked the horn and waved at Ms. Peralta. She attempted to ignore the Defendant, but he continued following her. In response, she slammed on the brakes in order to get away from the Defendant. Although she had hoped the Defendant would drive away, the Defendant "all of the sudden just got on [her] side of the road." Ms. Peralta said that the Defendant attempted to strike her Chrysler Pacifica with the Explorer and that she drove onto a curb to prevent a collision. Ms. Peralta was on the telephone with the police by this time because she was scared that something was going to happen to her. She wanted to get away from the Defendant, and she feared the Defendant would follow her to work.

We conclude that this evidence is sufficient to support the Defendant's convictions. The Defendant used his vehicle, a deadly weapon, to cause Ms. Peralta to reasonably fear bodily injury. The Defendant attempted to strike Ms. Peralta's car, causing her to drive off of the roadway to prevent a collision and potential injury. She expressed fear that something would happen to her and called the police during the incident because of her fear. Although the Defendant argues that the State failed to present corroborating evidence to support Ms. Peralta's testimony, the victim's testimony is sufficient to support the convictions. *See State v. Bond*s, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005). Likewise, Ms. Peralta was a domestic abuse victim because she and the Defendant had been in a romantic relationship and shared a child. The Defendant is not entitled to relief on this basis.

The Defendant, likewise, asserts that the trial court erred by failing to merge the aggravated assault and domestic assault convictions. The Defendant does not cite to any legal authority supporting merger of the convictions. The record reflects that at the sentencing hearing, the prosecutor asked the trial court if it was going to merge the aggravated assault and domestic assault convictions, and the court declined without explanation. The Defendant did not request merger or comment on the trial court's decision at the sentencing hearing, and the Defendant's motion for a new trial is not contained in the appellate record. Likewise, the record before us does not reflect that the Defendant raised this issue in the trial court. The Defendant has not requested plain error review, although the State asserts that the Defendant is not entitled to plain error relief.

-11-

*See State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). We decline to review the issue for plain error.[1] The Defendant is not entitled to relief on this basis.

## B.    Vandalism

"A person commits the offense of vandalism who knowingly . . . [c]auses damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent[.]"  T.C.A. § 39-14-408(b)(1). Damage is defined, in relevant part, as "[t]ampering with property and causing pecuniary loss or substantial inconvenience to the owner."  *Id*. § 39-14-408(a)(1)(B).  Vandalism valued at $1000 or less is a Class A misdemeanor. *See id*. §§ 39-14-408(c)(1); 39-14-105(a)(1).

The Defendant's two vandalism convictions relate to the vehicles owned by Ms. Davidson.  In the light most favorable to the State, the evidence reflects that Ms. Davidson's Dodge truck and Chrysler 200 were operational on January 1, 2018. However, on January 2, she found two flat tires on her Chrysler 200.  The key fob she kept inside the car was missing, as well, and was later found under her truck.  On January 3, Ms. Davidson's truck would not start.  Bradley Blackburn inspected the truck, and he discovered that the truck's starter had been unplugged, which he described as "petty stuff" meant to prevent the vehicles from being driven.  He was able to repair the truck by plugging in the starter and installing fuses.  However, Ms. Davidson's Chrysler 200 required a mechanic for repair.  Mr. Middleton, who had performed routine service on the car since Ms. Davidson purchased it, testified that the car was towed to his service center and that a "gritty-looking" substance was inside the fuel tank.  He said that the substance was not consistent with someone's placing diesel inside a gasoline fuel tank accidentally and that he did not find water inside the tank.  Mr. Middleton determined that trash had clogged the fuel injector, that someone had placed something inside the fuel tank from outside the car, and that it was not accidental.  The cost to repair the Chrysler 200 was less than $1000.

The Defendant threatened to vandalize Ms. Davidson's vehicles on multiple occasions.  Bradley Blackburn, who worked with the Defendant, testified that the Defendant reported being upset with Ms. Peralta and Ms. Davidson.  On and before January 2, the Defendant told Mr. Blackburn that the Defendant was going to "mess up" Ms. Davidson's and Ms. Peralta's vehicles to prevent them from going to work.  The Defendant told Mr. Blackburn that the Defendant was "going to f--- up their s---."  Mr. Blackburn understood that the Defendant was angry because the Defendant and Ms. Peralta's relationship was ending and that the Defendant was moving out of their home.

---

[1] A panel of this court has previously determined that dual convictions for aggravated assault and domestic assault do not violate a clear and unequivocal rule of law pursuant to plain error review.  *See State v. Ronnie Thomas Baker*, No. M2018-02221-CCA-R3-CD, 2019 WL 4899761, at *6-8 (Tenn. Crim. App. October 4, 2019).

Likewise, Ms. Davidson and Ms. Peralta both testified that the Defendant threatened to damage their vehicles before the incidents occurred and that the Defendant was angry because Ms. Peralta ended their relationship.

We conclude that the evidence is sufficient to support the Defendant's misdemeanor vandalism convictions. Based upon the evidence, the jury could have reasonably inferred that the Defendant knowingly damaged Ms. Davidson's truck and car without Ms. Davidson's effective consent and that the damage to each was less than $1000. *See Dorantes*, 331 S.W.3d at 379-81. The Defendant is not entitled to relief on this basis.

## C.  Aggravated Criminal Trespass

A person commits aggravated criminal trespass who enters or remains on property when:

(1)  The person knows the person does not have the property owner's effective consent to do so; and

(2) The person intends, knows, or is reckless about whether such person's presence will cause fear for the safety of another; or

(3)  The person, in order to gain entry to the property, destroys, cuts, vandalizes, alters or removes a gate, signage, fencing, lock, chain or other barrier designed to keep trespassers from entering the property.

T.C.A. § 39-14-406(a)(1)-(3). Owner is defined as "a person in lawful possession of property whether the possession is actual or constructive." *Id.* § 39-14-401(3) (2018). Aggravated criminal trespass of a habitation is a Class A misdemeanor. *Id.* § 39-14-406(c).

In the light most favorable to the State, the evidence reflects that in October 2013, the Defendant and Ms. Peralta began a romantic relationship. The Defendant lived at Ms. Peralta's home for about three years with their children, which included a shared son. Although the Defendant lived at the home, Ms. Peralta was the sole owner, and the Defendant never possessed a key. When their relationship deteriorated in September or October 2017, Ms. Peralta told the Defendant to leave, but he refused. Ms. Davidson testified that the Defendant was "kicked out" of the home in October 2017. When the Defendant had not left by Christmas, Ms. Peralta left her home and moved into Ms. Davidson's home. Ms. Peralta stated that the Defendant became irate and that she was scared to return home.

-13-

On January 2, 2018, Ms. Peralta and Ms. Davidson drove to Ms. Peralta's home in order to gather some belongings. Ms. Davidson testified that the Defendant had already removed his belongings from Ms. Peralta's home by this time. Ms. Davidson and Ms. Peralta testified that the home had been ransacked, that Ms. Peralta's belongings had been destroyed, that a door had been torn off its hinges, and that the walls had been damaged. The children's clothes had been strewn about the home, Ms. Peralta's clothes had been ripped and cut, and various household items had been thrown throughout the home. As the women and children were leaving, the Defendant arrived at the home. Ms. Peralta said the Defendant was belligerent and threatened to kill her.

We conclude that the evidence is sufficient to support the conviction. Ms. Peralta was the sole owner of the home, and the Defendant was told to leave the home. The jury could have reasonably inferred that the Defendant entered the home without Ms. Peralta's consent. When the Defendant refused to leave the home, Ms. Peralta moved into her mother's home because she feared the Defendant. She was afraid to return home, as well. Furthermore, the Defendant had threatened Ms. Peralta numerous times in the days before the offenses, and, as a result, he knew that his presence inside the home would have caused her to fear for her safety. The Defendant is not entitled to relief on this basis.

## II. Consecutive Sentencing

The Defendant contends that his sentence is excessive. He argues that the trial court erred by ordering him to serve his effective sentence in this case with the six-year sentence he received in an unrelated drug case. The State responds that the trial court did not err by ordering consecutive service in this regard because the Defendant had an extensive criminal history and had been serving a sentence on probation at the time of the present offenses.

At the sentencing hearing, the presentence report was received as an exhibit. The report showed that the thirty-seven-year-old Defendant had previous convictions for driving when his license was revoked, two counts of the sale of less than one-half gram of methamphetamine, delivery of less than one-half gram of methamphetamine, three traffic violations, and one count of misdemeanor vandalism. The report showed that the Defendant received a six-year sentence on probation after serving 180 days for the drug-related offenses. The Defendant's probation was revoked after his arrest in the present case for testing positive for methamphetamine, failing to obey the law, and violating an order of protection.

The presentence report reflected that the Defendant left high school in the eleventh grade but obtained his GED. The Defendant reported having good mental and physical health. He reported drinking alcohol as a teenager and occasional use in adulthood but denied having a problem with alcohol. The Defendant first reported smoking marijuana

-14-

as a teenager and said he last smoked it in 2012. The Defendant reported first using methamphetamine at age twenty, with periodic use until 2017. He stated that he spent $50 per week when using methamphetamine, that he had a problem with methamphetamine, and that he had never entered a drug treatment program. The Defendant's employment history reflected nearly continuous employment as a welder, millwright worker, operator of heavy equipment, and cooling tower construction worker since adulthood. The report reflected that the Defendant had a moderate risk level for recidivism, based upon the Strong-R Assessment.

Kassandra Peralta testified that before the incidents in the case, she learned that the Defendant had been using drugs inside her home and around her children. She said that her children had seen "it" and that, as a result, she wanted the Defendant out of her home. She said that, during the time leading to the trial, she feared for her life and her children's lives because of all the threats the Defendant had made. She said that since the trial, she had difficulty sleeping and had continued looking out of her widows "day and night." She said that she had installed a security system with motion detectors at her home. She said that she did not want to have any contact with the Defendant again. She said that her children remained scared of the Defendant and that she "had to uproot" her children from their home and school because of his conduct.

On cross-examination, Ms. Peralta testified relative to the aggravated criminal trespass conviction that the Defendant lived at the home for three and one-half years. She agreed that some of the Defendant's belongings were inside the home at the time of the incident and said that the Defendant would not "get his stuff." She said that she initiated eviction proceedings against the Defendant through an order of protection. She said the Defendant "went ballistic." She denied that her and the Defendant's relationship difficulties were related to custody of the Defendant's daughter and said that she "was never stupid [enough] to marry him."

Relative to the January 1, 2018 incident, Ms. Peralta testified that she refused to allow the Defendant to take his daughter because the children had found drugs inside their home. Ms. Peralta said she told the Defendant that he would have to involve the police in order to obtain his daughter. Ms. Peralta said that the Defendant had been provided "plenty of chances" to rehabilitate, that he had gone "through the programs," and that he needed to go to prison.

The Defendant had completed various programs during his incarceration, and the diplomas and certificates were received as an exhibit.

The Defendant made an allocution to the trial court. The Defendant apologized to Ms. Peralta and Ms. Davidson for the "inconvenience" he caused. He disputed Ms. Peralta's testimony that he could not complete the appropriate programs based upon the

certificates and diplomas he had obtained. He said that he had attempted to change his life for his daughter and son. He requested "leniency just a little on any sentencing." He wanted to play a role in his son's life and said he had completed three anger management programs, three "Sense of Self" behavior courses, a program for incarcerated fathers, parenting classes, and approximately seventy behavioral courses. He said that he was likely the most "decorated" jail inmate. He said that he had been in confinement for sixteen months at the time of the sentencing hearing, that he had used this time to better himself, that he was not the same man, and that he was in recovery for a "drug problem." He said that he had obtained his GED and taken every class the jail offered.

The trial court considered the trial and sentencing hearing testimony and determined that the Defendant "basically terrorized" Ms. Peralta and Ms. Davidson for about ten days in January 2018. The court likewise considered the principles of sentencing, arguments of counsel, the presentence report, the mitigating and enhancement factors, the certificates presented by the Defendant, the Defendant's allocution, and the nature of the criminal conduct. The court stated that the Defendant intentionally vandalized the victims' property, entered Ms. Peralta's home for the purpose of destroying property, and attempted to run Ms. Peralta off the road, which the court considered the most serious offense.

The trial court determined that the Defendant had "made some effort" since his arrest on January 11, 2018, based upon his participation in rehabilitative programs. The court noted that the Defendant was serving a sentence on probation at the time the offenses were committed, that his probation was revoked, and that he was ordered to serve his six-year sentence in confinement. Relative to the Defendant's potential for rehabilitation and treatment, the court said the evidence showed that the Defendant's "issues" stemmed from his drug use.

The trial court determined that the Defendant had three previous felony convictions, all of which involved methamphetamine. The court determined that the Defendant's convictions related to three counts of the sale and the delivery of methamphetamine, that the Defendant pleaded guilty, and that the Defendant received concurrent six-year sentences with 180 days to serve and the remainder on probation "supervised by Community Corrections." The court determined that these offenses occurred within the same twenty-four-hour period and that, as a result, the Defendant was a Range I, standard offender for sentencing purposes.

Relative to mitigation evidence, the trial court considered the Defendant's "very good" employment history, in which the Defendant had worked as a welder most of his adult life. *See* T.C.A. § 40-35-113(13) (2019) ("Any other factor consistent with the purposes of this chapter.").

The trial court applied enhancement factors (1), (3), (8), and (13). *See id.* § 40-35-114 (2019). The court determined that the Defendant had three previous felony drug convictions and five misdemeanor convictions, which included vandalism and driving when his license was suspended. The court determined that the Defendant had "somewhat [of an] extensive criminal history." Relative to criminal behavior, the court also considered the Defendant's methamphetamine use for a sixteen-year period between 2001 and 2017, noting that the Defendant tested positive for methamphetamine after his arrest in this case. The court determined that the failed drug test was also a basis for revoking the Defendant's probation in the unrelated drug case. The court also considered the Defendant's admitted marijuana use. The court gave "great weight" to the Defendant's criminal behavior and drug use. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]").

The trial court determined that the Defendant had failed, before trial or sentencing, to comply with the conditions of a sentence involving release into the community and that the Defendant was serving a sentence on probation at the time he committed the present offenses. *See id.* § 40-35-114(8), (13). The court stated that, in 2016, the Defendant received a six-year sentence on probation for the previous drug-related convictions, that the Defendant was on probation at the time of the present offenses, and that the Defendant "didn't follow the rules" of probation. The court placed great weight on these factors. The court determined that Ms. Peralta and Ms. Davidson were each victims in this case but declined to enhance the Defendant's sentence on this basis. *See id* § 40-35-114(3) ("The offense involved more than one (1) victim[.]").

The trial court stated that although the Defendant had completed programs to better himself during his confinement, the Defendant should have begun to better his life when he pleaded guilty to the drug-related charges that resulted in probation. The court found that although the Defendant served 180 days in confinement, he "went right back out to doing the same thing, using drugs." The court said that it would not give the Defendant "much credit other than . . . compliment [the Defendant] in terms of trying to do something since you've been revoked."

The trial court credited Ms. Peralta's testimony that she feared the Defendant and credited Ms. Davidson's testimony that she feared the Defendant, as well.

The trial court imposed six years for the aggravated assault against Ms. Peralta and eleven months, twenty-nine days at 75% service for the domestic assault against Ms. Peralta. The court imposed eleven months, twenty-nine days at 75% service for each vandalism conviction against Ms. Davidson. The court imposed eleven months, twenty-nine days at 75% service for the aggravated criminal trespass of Ms. Peralta's home. The court ordered concurrent service of the misdemeanor sentences but consecutive service

with the six-year sentence, for an effective sentence of six years, eleven months, and twenty-nine days. The court ordered partial consecutive service based upon the Defendant's extensive criminal history and upon the Defendant's serving a sentence on probation at the time of the present offenses.

The trial court ordered the Defendant to serve his effective sentence consecutively with the six-year sentence imposed in the drug-related case. The court ordered consecutive service on the grounds that the Defendant had been serving the six-year sentence on probation at the time he committed the present offenses and that the Defendant had continued to use drugs while on probation.

The trial court denied the Defendant's request for alternative sentencing on the basis that his continued criminal conduct demonstrated he could not comply with the terms of release. The court determined that alternative sentencing would unduly depreciate the seriousness of the offenses and that less restrictive measures had been recently applied without success. As a result, the court determined that the Defendant was not an appropriate candidate for alternative sentencing.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2018).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The record reflects that, at the time of the present offenses, the Defendant was serving a six-year sentence on probation after having served 180 days' confinement for his methamphetamine-related felony convictions. The presentence report reflected that his probation was revoked after his arrest in the present case on the grounds that he violated an order of protection, tested positive for methamphetamine, and failed to obey the law by committing new offenses. Therefore, the trial court determined that the Defendant had committed the present offenses when he was serving a sentence on probation. *See* T.C.A. § 40-35-115(b)(6) ("The court may order sentences to run consecutively if the court finds by a preponderance of the evidence that . . . [t]he defendant is sentenced for an offense committed while on probation[.]"). We conclude that the trial court did not abuse its discretion by ordering consecutive service of the Defendant's effective sentence in the present case with the six-year sentence he was serving on probation when the present offenses occurred. Likewise, the record reflects that the court considered the appropriate principles of sentencing in making its sentencing determinations. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-19-